# United States Court of Appeals for the Federal Circuit

---

**SAEED TAVAKKOL,**
*Petitioner*

**v.**

**MERIT SYSTEMS PROTECTION BOARD,**
*Respondent*

---

2024-1514

---

Petition for review of the Merit Systems Protection Board in No. SF-0752-19-0587-I-1.

---

Decided: May 14, 2026

---

HOWARD BRANDON ZAKAI, Granger & Associates LLC, New York, NY, argued for petitioner. Also represented by RAYMOND R. GRANGER.

CONSTANCE E. TRAVANTY, Office of the General Counsel, United States Merit Systems Protection Board, Washington, DC, argued for respondent. Also represented by ALLISON JANE BOYLE, KATHERINE MICHELLE SMITH.

---

Before DYK, REYNA, and STOLL, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* STOLL.

Concurring opinion filed by *Circuit Judge* REYNA.

STOLL, *Circuit Judge*.

Mr. Saeed Tavakkol petitions for review of the dismissal of his appeal for lack of jurisdiction by the Merit Systems Protection Board. Because we determine Mr. Tavakkol did not non-frivolously allege that his voluntary resignation from the United States Postal Service was the result of duress, coercion, or misinformation provided by the agency, we affirm the Board's dismissal of Mr. Tavakkol's appeal.

BACKGROUND

I

Mr. Tavakkol was hired by the United States Postal Service (USPS) as an Operations Industrial Engineer at USPS's Seattle Network Distribution Center on October 5, 2013. His duties involved "overseeing and applying 'nationwide industrial engineering, standardization, and continuous improvement policies, standards, and processes to improve service and cost performance through direct involvement in mail processing operations.'" J.A. 2 (citation omitted).

According to Mr. Tavakkol, beginning in December 2013, he "was harassed because of [his] national origin, race[,] and religion . . . by [his] assigned mentor." J.A. 232. His assigned mentor, Mr. Don Hamel, "frequently made derogatory comments such as '[g]o back to your country[,]' '[w]ho needs foreigners anyway . . . [,]' and '[i]f you don't play the game, you will get a knife in the back in this organization.'" *Id.* Mr. Tavakkol complained about the harassing behavior in March 2014, but his manager "took no action to address [his] complaint." *Id.*

Mr. Tavakkol was also allegedly subject to "retaliatory and harassing actions in response to his alleged whistleblowing activities." J.A. 3. In particular, he received a

Letter of Warning (LOW) regarding safety-related statements he made while on a national teleconference. Through mediation conducted by the agency's Equal Employment Opportunity (EEO) Office, USPS agreed to withdraw the LOW. However, Mr. Tavakkol's supervisors proceeded to place him on a Performance Improvement Plan (PIP) and issue him a Letter of Concern (LOC), citing the withdrawn LOW as a basis for each action.

As a result of the harassment occurring in his work environment, Mr. Tavakkol claims he began to experience "physical pain, depression[,] and anxiety." J.A. 145. On February 2, 2015, he submitted medical documentation and requested to take medical leave for two weeks. USPS responded to Mr. Tavakkol's submitted medical documentation, interpreting it "as both a restriction in [him] returning to [his] current job and as a request for reasonable accommodation." J.A. 247. Accordingly, USPS referred Mr. Tavakkol's request to the USPS Seattle District's Reasonable Accommodation Committee (DRAC). *Id.* On February 19, 2015, Mr. Tavakkol submitted further medical documentation indicating he would be on leave through May 23, 2015.

On or about March 17, 2015, proceeding pro se while he was on medical leave, Mr. Tavakkol filed a complaint with the Equal Employment Opportunity Commission (EEOC) alleging USPS discriminated against him (1) "on the bases of his race (Middle Eastern/Persian), religion (Islam), national origin (Iranian)[,] and/or in reprisal for his prior EEO activity," and (2) "on the bases of his age . . . , disability/perceived disability (adjustment disorder, depression[,] and anxiety)[,] and/or in reprisal for his prior EEO activity when in March 2015, [USPS] denied his request for reasonable accommodation." J.A. 48–49; J.A. 4.

On March 27, 2015, the DRAC sent Mr. Tavakkol a letter denying what had been construed as his request for reasonable accommodation. In the letter, the DRAC informed

Mr. Tavakkol it "determined that [he could not] perform [his] position with or without accommodation" because Mr. Tavakkol's only requested accommodation was to "not work for or in a position that report[ed] to" plant manager Kenn Messenger. J.A. 245. The DRAC told Mr. Tavakkol he could request reconsideration by contacting the designated human resources representative. J.A. 246. Mr. Tavakkol alleges he attempted to contact that representative but never received a response. J.A. 160.

On May 14, 2015, Mr. Jerry Lane, Mr. Tavakkol's supervisor, attempted[1] to send Mr. Tavakkol a letter requesting return-to-work documentation, indicating a response was required to the letter by May 21, 2015. Then on May 27, 2015, after receiving no additional documentation or further communication from Mr. Tavakkol, Mr. Lane sent Mr. Tavakkol notice that he was placing Mr. Tavakkol on absent without official leave (AWOL) status. J.A. 241. Mr. Lane's letter directed Mr. Tavakkol to "contact [him] by 2:00 pm on Thursday June 4, 2015 to" discuss Mr. Tavakkol's employment intentions. *Id.*

On July 17, 2015, while the EEOC case was still pending, Mr. Tavakkol resigned from his position via letter, detailing the reasons for his resignation, including whistleblower reprisal and discrimination. J.A. 232–37. On July 31, 2015, USPS processed Mr. Tavakkol's resignation with an effective date of July 20, 2015. J.A. 231. The last day Mr. Tavakkol ever reported to his position was February 2, 2015, and he never returned to his position prior to his resignation.

On April 1, 2019, the EEOC granted summary judgment in favor of USPS, determining that "even when

---

[1]    Mr. Tavakkol alleges he never received this letter because two of the digits in the address were inverted. *See* Pet. Br. 17.

viewing the evidence in a light most favorable [to Mr. Tavakkol], the record fail[ed] to demonstrate that [USPS] unlawfully discriminated against him." J.A. 66. In particular, the EEOC administrative judge determined Mr. Tavakkol failed to (1) "set forth any factual evidence of an adverse employment action with regard to several of his allegations of discrimination," and (2) "identify any adverse employment action by virtue of [USPS]'s alleged failure to implement his . . . proposals" or heed his concerns related to safety. J.A. 61–62.

## II

On July 26, 2019, over four years after his resignation and almost four months after the EEOC decision, Mr. Tavakkol filed an appeal with the Board. He alleged his resignation from USPS "was involuntary because of duress, coercion[,] and misrepresentation by the agency." J.A. 163. Mr. Tavakkol advanced three reasons for his involuntary resignation:

> (1) [H]e was "persecuted for disclosure of enormous wastefulness, gross mismanagement[,] and widespread safety violations" by the agency; (2) the agency's harassment caused him "physical pain, severe anxiety[,] and depression," which he allege[d] were diagnosed by his medical providers as being stress related; and (3) the agency denied his reasonable accommodation request, thereby effectively taking away his job.

J.A. 10 (citation omitted).

In the Initial Decision, the administrative judge found Mr. Tavakkol "failed to non-frivolously allege that his decision to resign was the result of coercion, misinformation, misrepresentation, or deception on the agency's part, or that it was so intolerable that he had no choice but to resign when he did." J.A. 13. With regard to Mr. Tavakkol's allegation that the denial of reasonable accommodation

effectively took away his job, the administrative judge found USPS "in fact ordered [Mr. Tavakkol] to return to work once his medical leave had ended" and further found Mr. Tavakkol "ha[d] not offered any evidence or argument suggesting that any agency manager informed him that he no longer had a job to return to." J.A. 10.

The administrative judge also found "the record d[id] not support an allegation that [Mr. Tavakkol] was subjected to a hostile work environment or intolerable working conditions at the time he submitted his resignation, such that a person in his position would have felt compelled to resign." J.A. 11. In support, the administrative judge noted Mr. Tavakkol had "extricated himself from the alleged harassing and discriminatory environment" approximately five months before his resignation. *Id.* In addition, the administrative judge found Mr. Tavakkol's resignation was not involuntary because Mr. Tavakkol "chose to resign while his EEO complaint was still pending," demonstrating he chose "to resign or retire rather than 'stand and fight' against the alleged discrimination or retaliation." J.A. 11–12 (citing, *inter alia, Garcia v. Dep't of Homeland Sec.*, 437 F.3d 1322, 1329 (Fed. Cir. 2006) (en banc); *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007)). Ultimately, the administrative judge found the evidence did "not rise to the level of coercion necessary to overcome the presumption that his resignation was voluntary, particularly given the length of time between the alleged events and his decision to resign and the fact that he had not yet exhausted his challenges to [USPS's] alleged discriminatory and harassing activity." J.A. 12 (citation omitted). Therefore, the administrative judge found Mr. Tavakkol "failed to non-frivolously allege that his decision to resign was the result of coercion, misinformation, misrepresentation, or deception on the agency's part, or that it was so intolerable that he had no choice but to resign when he did," and he dismissed Mr. Tavakkol's appeal for lack of jurisdiction. J.A. 13–14.

The Board affirmed the administrative judge's dismissal. The Board agreed that Mr. Tavakkol "failed to allege facts that would cause the reasonable person in his position to retire." J.A. 29. The Board was not persuaded by Mr. Tavakkol's argument on review that he was "too ill to pursue his EEO claim," and the Board noted Mr. Tavakkol's resignation letter "contain[ed] detailed allegations reflecting [Mr. Tavakkol's] ability to continue to advocate on his own behalf." J.A. 31–32.

Then the Board, in examining Mr. Tavakkol's claim that his resignation was the result of a denial of a reasonable accommodation, found USPS "acted properly by initiating discussions with [Mr. Tavakkol] regarding reasonable accommodation." J.A. 33. The Board further found that, in the DRAC process for reasonable accommodation, the DRAC communicated with Mr. Tavakkol, issued a decision, and provided him "with the option to request reconsideration through a human resources manager." J.A. 34.[2] And finally, based on evidence that USPS ordered Mr. Tavakkol to return to work, the Board found there was "no evidence that [USPS] suggested that [Mr. Tavakkol] no longer had a job." J.A. 34. Accordingly, the Board determined Mr. Tavakkol "failed to non[-]frivolously allege that his resignation was the result of a wrongful processing or denial of his reasonable accommodation request." *Id.*

---

[2]    The Board stated Mr. Tavakkol "d[id] not state exactly what steps he took following the DRAC decision and d[id] not claim he requested reconsideration of the DRAC decision," and thus, the Board "lack[ed] any specific information from which to conclude that the agency acted improperly by not responding to [Mr. Tavakkol]." J.A. 34. Mr. Tavakkol challenges this finding. *See* Pet. Br. 15–16 (citing J.A. 135).

The administrative judge's Initial Decision, supplemented by the Board's Final Order, became the Board's Final Decision.  J.A. 35.  Mr. Tavakkol petitions for review, and we have jurisdiction under 28 U.S.C. § 1295(a)(9).

## DISCUSSION

We address here whether Mr. Tavakkol made non-frivolous allegations of involuntary resignation such that he is entitled to a jurisdictional hearing.  If "a claimant makes non-frivolous claims of Board jurisdiction, namely claims that, if proven, establish the Board's jurisdiction, then the claimant has a right to a hearing."  *Garcia*, 437 F.3d at 1344.  "If at the hearing the claimant establishes the Board's jurisdiction by a preponderance of the evidence, then jurisdiction attaches to the case and the Board has the power to decide the merits of the claim."  *Id.* at 1330.

As noted previously, the Board here determined Mr. Tavakkol did not make non-frivolous claims and therefore dismissed Mr. Tavakkol's appeal for lack of jurisdiction.  We must affirm the Board's decision unless it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c).  "Whether the [B]oard has jurisdiction to adjudicate an appeal is a question of law . . . ." *Ricci v. Merit Sys. Prot. Bd.*, 953 F.3d 753, 756 (Fed. Cir. 2020). We review "the record *de novo* and determine whether [the petitioner] has made non-frivolous allegations" that could, if proven, establish jurisdiction.  *Coradeschi v. Dep't of Homeland Sec.*, 439 F.3d 1329, 1332 (Fed. Cir. 2006); *see also Wyche v. Dep't of Lab.*, 180 F. App'x 965, 967 (Fed. Cir. 2006) (non-precedential) ("We review de novo whether an appellant made non-frivolous allegations of a fact necessary to establish jurisdiction.").

I

On appeal, Mr. Tavakkol primarily asserts that he presented non-frivolous allegations of intolerable working conditions that caused him to suffer anxiety, depression, and physical pain and coerced him to resign. *See* Pet. Br. 37. As we have explained, "[n]othing in 5 U.S.C. § 7512, which enumerates [the] specific adverse actions over which the Board has jurisdiction, extends the Board's jurisdiction to facially voluntary acts." *Garcia*, 437 F.3d at 1328. But while an employee who voluntarily resigns or retires has no right to appeal to the Board, the Board "possesses jurisdiction over an appeal filed by an employee who has resigned or retired if . . . his or her resignation or retirement was involuntary and thus tantamount to forced removal." *Id.* (omission in original) (quoting *Shoaf v. Dep't of Agric.*, 260 F.3d 1336, 1341 (Fed. Cir. 2001)). "In other words, . . . 'an involuntary resignation constitutes an adverse action by the agency.'" *Id.* (quoting *Gratehouse v. United States*, 512 F.2d 1104, 1108 (Ct. Cl. 1975)).

We have previously considered cases where "claimants have alleged that the agency coerced them 'by creating working conditions so intolerable for the employee that he or she is driven to involuntarily resign or retire.'" *Id.* at 1328–29 (first citing *Shoaf*, 260 F.3d at 1341; then *Staats v. U.S. Postal Serv.*, 99 F.3d 1120, 1123 (Fed. Cir. 1996); and then *Christie v. United States*, 518 F.2d 584, 587 (Ct. Cl. 1975)). When a claimant relies on evidence of discrimination in connection with a claim of involuntary resignation or retirement, in deciding if the Board has jurisdiction, we consider only whether the evidence of discrimination goes to coercion, not whether it meets the test for proof of discrimination. *See id.* at 1330–31 (discussing how in *Cruz v. Department of the Navy*, 934 F.2d 1240 (Fed. Cir. 1991) (en banc), where "issues of involuntariness were mixed with claims of discrimination," the Board's jurisdiction would only attach when "an employee carries his or her burden of establishing that a self-initiated personnel

action was coerced or otherwise involuntary"); *see also id.* at 1341 ("Discrimination issues may be considered insofar as they illuminate involuntariness.").

"An employee asserting that his or her resignation was involuntary must show that it was the result of duress, coercion, or misinformation provided by the agency." *Tretchick v. Dep't of Transp.*, 109 F.3d 749, 751 (Fed. Cir. 1997). Mr. Tavakkol asserts his resignation was involuntary due to coercion. *See* Pet. Br. 1. We have adopted the *Fruhauf* test for establishing involuntary coercion by an agency:

> [T]o establish involuntariness on the basis of coercion this court requires an employee to show: (1) the agency effectively imposed the terms of the employee's resignation or retirement; (2) the employee had no realistic alternative but to resign or retire; and (3) the employee's resignation or retirement was the result of improper acts by the agency.

*Garcia*, 437 F.3d at 1329 (alteration in original) (citation omitted). "In evaluating involuntariness, the proper test is an objective one, and one that considers the totality of the circumstances." *Id.* (cleaned up) (citation omitted). "The employee must 'establish that a reasonable employee confronted with the same circumstances would feel coerced into resigning.'" *Id.* (quoting *Middleton v. Dep't of Def.*, 185 F.3d 1374, 1379 (Fed. Cir. 1999)). "In other words, when adjudicating a claim of coercive involuntariness, the three elements of the *Fruhauf* test are evaluated from the perspective of the reasonable employee confronted with similar circumstances." *Id.* (citation omitted).

"[O]ur case law has . . . emphasized that freedom of choice is a central issue" to the objective test for involuntariness. *Id.* For example, in *Garcia*, we cited to our predecessor court's holding in *Christie* that:

> [W]hile it is possible plaintiff, herself, perceived no viable alternative but to tender her resignation, the record evidence supports [the agency's] finding that plaintiff chose to resign and accept discontinued service retirement rather than challenge the validity of her proposed discharge for cause. The fact remains, plaintiff *had a choice*. She could stand pat and fight. She chose not to.

*Id.* (quoting *Christie*, 518 F.2d at 587). In other words, coercive involuntariness would not apply when an employee's decision to resign arises because "he does not want to accept a new assignment, a transfer, or other measures that the agency is authorized to adopt, even if those measures make continuation in the job so unpleasant for the employee that he feels that he has no realistic option but to leave." *Id.* (quoting *Staats*, 99 F.3d at 1124). That an employee must face "an unpleasant situation or that his choice is limited to two unattractive options does not make the employee's decision any less voluntary." *Id.* (quoting *Staats*, 99 F.3d at 1124). Our cases also "recognize that most resignations and retirements are not constructive removals, and that 'the doctrine of coercive involuntariness is a narrow one' requiring that the employee 'satisfy a demanding legal standard.'" *Id.* (citation omitted).

## II

Here, accepting all of Mr. Tavakkol's factual allegations as true, we agree with the Board that Mr. Tavakkol has not non-frivolously alleged that his decision to resign was the result of coercion by USPS. In particular, *Fruhauf* factors one and two, which are evaluated from the perspective of a reasonable employee confronted with similar circumstances, warrant this conclusion. Though facing a difficult work environment that was documented to have caused medical issues rendering him unable to work through May 23, 2015, *see* J.A. 242, Mr. Tavakkol has not non-frivolously alleged, for example, that a reasonable

employee in his situation would understand USPS to have effectively imposed the terms of his resignation or retirement (*Fruhauf* factor one). Because he did not submit medical documentation covering the period after May 26, 2015, USPS placed Mr. Tavakkol on AWOL status once he failed to report for work. J.A. 241. It is undisputed that Mr. Lane sent—and Mr. Tavakkol received, *see* Pet. Br. 47—a letter informing him of his AWOL status, directing him to return to work "absent any medical restrictions" and documenting that Mr. Tavakkol had not called Mr. Lane to "request additional leave" or provide medical "paperwork in an effort to return to duty." J.A. 241. Mr. Lane also directed Mr. Tavakkol: "You need to contact me by 2:00 pm on Thursday June 4, 2015 to let me know what your intentions are." *Id.* The record does not show Mr. Tavakkol ever contacted Mr. Lane, nor does it show Mr. Tavakkol returned to work. Rather, Mr. Tavakkol submitted his letter of resignation on July 17, 2015, *see* J.A. 232–37, and filed for state unemployment benefits, which were granted due to medical disability, J.A. 162–63. The record belies Mr. Tavakkol's assertion that "USPS was improperly dictating the terms of Mr. Tavakkol's termination by preventing him from working," Pet. Br. 51, because Mr. Lane's May 27 letter specifically directed Mr. Tavakkol to contact Mr. Lane and to return to work "absent any medical restrictions." J.A. 241.

We are not convinced by Mr. Tavakkol that the record evidences a "manipulation" of the reasonable accommodation process by USPS such that USPS "dictat[ed] the terms of Mr. Tavakkol's termination." Pet. Br. 51.[3] The record

---

[3]    We note that Mr. Tavakkol is not advancing a theory here that his resignation was involuntary due to the denial of a reasonable accommodation. *See* ECF No. 24 at 20 ("Petitioner does not argue that USPS was required to provide a reasonable accommodation or that USPS

shows Mr. Lane referred Mr. Tavakkol to the DRAC because Mr. Tavakkol's medical documents implied he might need "a change of employment." J.A. 247. And while accepting Mr. Tavakkol's assertion that he subjectively interpreted the DRAC's letter as meaning "that there was no position to which he could return" as true, Pet. Br. 53, that interpretation was no longer reasonable when he received Mr. Lane's May 27 letter informing him he was being placed on AWOL status for failure to report to the position he did in fact still hold and directing him to return to work. *See* J.A. 241.

We also agree with the Board that Mr. Tavakkol did not non-frivolously allege that a reasonable employee in his situation would have no realistic alternative but to resign or retire (*Fruhauf* factor two). Mr. Tavakkol did not present medical documentation supporting his inability to work after May 26, 2015, he filed an EEOC complaint in March 2015, and he resigned while his EEOC complaint was still pending. After 180 days of inaction by the EEOC, Mr. Tavakkol could have brought an action in district court. *See* 29 C.F.R. § 1614.407. Significantly, before us, Mr. Tavakkol's petition for review concerns only whistleblower retaliation, as he chose to waive discrimination-related claims to proceed here rather than in district court. *See* ECF No. 12. But Mr. Tavakkol admits he did not pursue the specific remedies made available by the Whistleblower Protection Act at the time of his resignation, including by filing a complaint with the Office of Special Counsel and invoking an individual right of action to the Board, if necessary. Oral Arg. at 3:16–3:33, https://www.cafc.uscourts.gov/oral-arguments/24-1514_11072025.mp3; *see* 5 U.S.C. §§ 1214(a), 1221.

---

otherwise discriminated against him because of his medical condition.").

14                                                    TAVAKKOL v. MSPB

The record therefore indicates that Mr. Tavakkol had two alternatives in front of him, resign or stand and fight, and he chose the former. Our precedent holds that choosing between standing and fighting—i.e., challenging the agency conduct while still employed—or resigning demonstrates a freedom of choice between alternatives rather than an involuntary resignation. *Christie*, 518 F.2d at 587 (determining when the employee resigned rather than "stand[ing] pat and fight[ing]" the agency's proposed removal, her choice to resign was a voluntary one); *Garcia*, 437 F.3d at 1329 (noting the choice between resigning or standing and fighting "emphasized th[e] freedom of choice"); *see also Heining v. Gen. Servs. Admin.*, 68 M.S.P.R. 513, 523 (1995) (the Board finding involuntary resignation since the employee "not only . . . offer[ed] an overwhelming amount of evidence supporting an intolerable working environment, . . . she did not resign until she pursued many grievances and two complaints[ and] receiv[ed] an adverse decision on her grievances"). And while the options to stand and fight or resign could both be unattractive or undesirable, that an employee "is limited to two unattractive options does not make the employee's decision any less voluntary." *Staats*, 99 F.3d at 1124.[4]

---

[4] The concurrence views our opinion as implying "an employee will *always* have a 'reasonable alternative'—and therefore fail to non-frivolously allege involuntary resignation—unless he has exhausted all pending administrative challenges to the agency's offending conduct during his employment." Concurrence Op. 2 (emphasis added). We make no such implication. Rather, we simply acknowledge that the totality of the circumstances here do not support a non-frivolous allegation that a reasonable employee in Mr. Tavakkol's situation would have no realistic alternative but to resign or retire. This opinion does not foreclose that in some circumstances, an employee could

Before us, Mr. Tavakkol relies on our opinion in *Trinkl v. Merit Systems Protection Board*, 727 F. App'x 1007 (Fed. Cir. 2018) (non-precedential), to support his claim of involuntary resignation. *See* Pet. Br. 40–45. But *Trinkl* is distinguishable because, among other reasons, "Trinkl submitted his retirement paperwork approximately two months after the investigation into his . . . discrimination claims . . . concluded," 727 F. App'x at 1010, whereas here, Mr. Tavakkol retired while his EEOC claim was still pending. Therefore, Mr. Trinkl tried to stand and fight throughout the pendency of his discrimination claims, while Mr. Tavakkol did not.

In sum, after review of the totality of the circumstances in this particular case, we determine Mr. Tavakkol has not non-frivolously alleged involuntary resignation such that he is entitled to a jurisdictional hearing before the Board.

## CONCLUSION

We have considered Mr. Tavakkol's remaining arguments and find them unpersuasive. For the foregoing reasons, we affirm the Board's dismissal of Mr. Tavakkol's appeal for lack of jurisdiction.

## **AFFIRMED**

### COSTS

No costs.

---

non-frivolously allege that a reasonable person would not "stand pat and fight" any longer.

# United States Court of Appeals for the Federal Circuit

---

**SAEED TAVAKKOL,**
*Petitioner*

**v.**

**MERIT SYSTEMS PROTECTION BOARD,**
*Respondent*

---

2024-1514

---

Petition for review of the Merit Systems Protection Board in No. SF-0752-19-0587-I-1.

---

REYNA, *Circuit Judge*, concurring.

I agree with the majority's conclusion that Mr. Tavakkol failed to non-frivolously allege his resignation was the result of coercion by USPS. But I take issue with the notion that, because Mr. Tavakkol had a pending EEOC complaint at the time of his resignation, that necessarily means he had a "realistic alternative" to resignation. Majority Opinion ("Op.") 13–14. Requiring an employee, while still employed, to see an administrative challenge (here, an EEOC complaint) to the agency's conduct through to completion before the employee can bring a claim for involuntary resignation is an unjust principle.

The Supreme Court has recognized, in a similar context, the problematic burden such a requirement places on employees. In *Green v. Brennan*, the Court considered an

employee's claim for constructive discharge based on discrimination under Title VII. 578 U.S. 547, 550 (2016). The Court resolved a circuit split as to when the limitations period for lodging an EEOC complaint for constructive discharge begins. *Id.* at 552. The Court held that an employee "cannot bring a constructive-discharge claim" with the EEOC "until he is constructively *discharged*," i.e., until he has resigned. *Id.* at 555 (emphasis in original). The Court reasoned that "forcing an employee to lodge a complaint" against the agency's conduct "before he can bring a claim for constructive discharge places that employee in a difficult situation." *Id.* at 557–58. For example, the employee might need to delay resignation "until he can afford to leave" or "in light of other circumstances," and "he may be reluctant to complain about discrimination while still employed," especially where a complaint "could risk termination." *Id.* at 558.

The majority's decision discounts entirely these concerns. According to the majority, an employee will always have a "reasonable alternative"—and therefore fail to non-frivolously allege involuntary resignation—unless he has exhausted all pending administrative challenges to the agency's offending conduct during his employment. Op. 14. The majority relies on one poorly decided opinion from our predecessor court—*Christie v. United States*, 518 F.2d 584 (Ct. Cl. 1975)—which held an employee's resignation voluntary where she "accept[ed] service retirement rather than challeng[ing] the validity of her proposed discharge for cause."[1] Op. 14. *Christie* states the employee could "stand pat and fight," but "chose not to." *Christie*, 518 F.2d at 587. But that fifty-year-old decision overlooked the

---

[1]    The majority also cites *Garcia v. Department of Homeland Security*. 437 F.3d 1322 (Fed. Cir. 2006). But *Garcia* merely cites *Christie* in providing an overview of coercive involuntary resignation. *Id.* at 1329.

practical burdens that such a blanket requirement inflicts on employees. *Christie* should not be read to impose a brightline rule that employees, like Mr. Tavakkol, are barred from challenging involuntary resignation absent resolution of all administrative challenges during employment.

The majority also cites a case from the Merit Systems Protection Board, *Heining v. General Services Administration*, 68 M.S.P.R. 513 (1995). Op. 14. That case, however, highlights a situation in which pursuing an EEOC complaint is *not* a "realistic alternative" to resignation. The employee there, Ms. Heining, although not having "pursued all statutorily prescribed avenues of redress," had already "pursued many grievances and two complaints." *Heining*, 68 M.S.P.R. at 523. Despite having a pending EEOC complaint when she resigned, the Board found that the "agency's inequitable handling of the investigations of her complaints and grievances constituted aggravating factors" contributing to an intolerable working condition. *Id.* at 517, 523. Thus, Ms. Heining's pending EEOC complaint did not foreclose a determination of constructive discharge.

This case is like *Heining* in this respect. Here, Mr. Tavakkol had already aired grievances about allegedly discriminatory treatment, J.A. 232, and had filed and mediated an EEOC complaint with USPS, J.A. 124–25, prior to his resignation. As to the allegedly discriminatory treatment, Mr. Tavakkol claims that his grievances were met with no action. Op. 2. And as to his prior EEOC complaint, although Mr. Tavakkol garnered a small win through EEOC mediation when USPS agreed to withdraw his Letter of Warning ("LOW"), Mr. Tavakkol's supervisors continued to reprimand him by citing the withdrawn LOW. Op. 3; J.A. 129–30. Specifically, USPS proceeded to place Mr. Tavakkol on a Performance Improvement Plan and issue him a Letter of Concern, citing the withdrawn LOW in each instance. Op. 3. Like in *Heining*, USPS's inequitable handling of Mr. Tavakkol's grievances and prior EEOC

complaint should be regarded as aggravating factors that contribute to an intolerable workplace.

For these reasons, I concur in the result but disagree that Mr. Tavakkol's pending EEOC complaint or his failure to file a complaint with the Office of Special Counsel during his employment provided a "realistic alternative" to resignation.